353 So.2d 579 (1977)
BERMIL CORPORATION, a Florida Corporation, Edward Leeds, Norman Morris and C.C.C. Investment Corporation, Appellants,
v.
Kay SAWYER d/b/a United Mortgage Company, Appellee.
Nos. 76-521, 76-657 and 76-658.
District Court of Appeal of Florida, Third District.
December 6, 1977.
Rehearing Denied January 16, 1978.
*581 Lapidus & Hollander and Richard L. Lapidus, Miami, for Bermil Corp.
Sibley, Giblin, Levenson & Glaser and Irving B. Levenson, Miami Beach, for Leeds, Morris & CCC Investment, appellants.
Male, Bloom, Bodne, Kuperstein & Eisenberg, Miami and Michael J. Fingar, Miami Lakes, for appellee.
Before HENDRY, C.J., and PEARSON and NATHAN, JJ.
HENDRY, Chief Judge.
These appeals, consolidated for all appellate purposes, are taken from three final judgments rendered pursuant to jury verdicts. The first judgment was rendered in favor of appellee/plaintiff Kay Sawyer and against appellant/defendant Bermil Corporation on a cause of action based upon a breach of a brokerage contract. Judgment number two was rendered in favor of Sawyer and against appellant/defendant Edward Leeds for the tortious interference with the above brokerage contract. The third and final judgment appealed from was rendered in favor of Bermil Corporation, as appellee/cross-plaintiff, and against appellants/cross-defendants Leeds, Norman Morris and C.C.C. Investment Corporation for damages based upon the jury's determination that a certain real property transaction entered into between the parties and designated by them as a sale with option to repurchase was, in reality, a device to disguise a usurious loan.
The salient facts, taken in the light most favorable to the various appellees, are as follows: on August 28, 1973, Bermil Corporation defaulted on a first mortgage which encumbered its Cypress Plaza Shopping Center in Pompano Beach, Florida. Unable to forestall the New York mortgagee any longer, Bermil Corporation, acting through its president, Milton Stein, began approaching various mortgage brokers for the needed money to satisfy the default.
*582 On or about December 7, 1973, Stein telephoned Kay Sawyer, a Dade County mortgage broker. That same day, Stein and Ms. Sawyer met in the latter's office at which time Stein signed a loan application. In pertinent part, the application provided that Stein agreed to pay Sawyer a $6,000.00 fee if she could obtain a $60,000.00 loan for him at the rate of 15% interest for 5 years. Later that day, Ms. Sawyer began her quest, burdened by the reality that Stein's financial difficulties, including the "failure" of other shopping centers owned by his corporation, would make the task difficult. She did, however, contact Edward Leeds, who demonstrated a serious interest in making the loan, upon the proper security being furnished.
A few days passed between the initial conversation of Leeds and Sawyer and a second conversation wherein Leeds agreed to loan the money at the aforementioned rate of interest secured by a mortgage on the property. Pursuant to this second conversation, the mortgage was to be taken in the name of C.C.C. Investment Corporation, a Florida corporation that had paid no income taxes since 1969; had held no director's or stockholder's meetings; and had been utilized to pay the personal debts of its sole stockholder, Leed's wife. Relying upon Leed's representation that he would fund the mortgage, Ms. Sawyer prepared a note and mortgage and recorded same.
On December 14, 1973, the resident agent of Bermil Corporation received a complaint for foreclosure, together with notice, stating that on December 21, 1973, a hearing was scheduled for the appointment of a receiver for the Cypress Plaza Shopping Center, predicated upon the failure of Bermil Corporation to pay the August, 1973, mortgage payment. According to the terms of the mortgage, upon default, the mortgagee had the right to accelerate the entire debt, which at that time, was nearly $2,000,000.00.
On December 19, 1973, two days prior to the receivership hearing (and after the note and mortgage had been recorded), a meeting was held in Ms. Sawyer's office attended by Stein, Leeds and Sawyer. After preliminary talks, Leeds put a check on the table for $57,000.00. When asked by Ms. Sawyer why the check was not in the heretofore agreed upon amount of $60,000.00, Leeds responded by saying that he would give her the $3,000.00 balance and told her not to worry about it. The tender was refused by Sawyer on the grounds that (1) the check had too many endorsements on its back and that (2) she was an "ethical broker" and "sometimes it [the funding of a mortgage note by a lender in an amount less than the actual face value of the note] could be a usurious transaction" resulting in the appearance "that there had been a kickback of some kind."
The next evening, with the receivership hearing the following day, Leeds telephoned Stein and told him that he would not fund the mortgage. Instead, Leeds suggested that for the same $60,000.00, he would buy 40% of the shopping center. On December 21, 1973, the following morning, Leeds and Stein met, at which time Leeds insisted upon being given a deed to 40% interest in the property. Having until noon of that day to make payment on the first mortgage, Stein agreed to the deed.
The terms of the transaction were as follows: Stein deeded over to C.C.C. Investment Corporation the 40% interest in the shopping center in exchange for $60,000.00, with an option to repurchase same at the end of one year for $100,000.00. Prior to the receivership hearing, upon negotiation with the mortgagee's attorney, $54,000.00 was paid to satisfy the default in the mortgage. Leeds kept the remaining $6,000.00 which had originally been earmarked as Sawyer's brokerage commission. As of the time of trial, Sawyer had not been paid for her efforts.
At the time of the transaction, the net income generated by the shopping center was over $50,000.00 per year. The stores at the shopping center were generally rented with long term leases and the revenue generated by said leases were constant. At trial, the value of the equity in the property was estimated at between $500,000.00 and $750,000.00.
*583 Subsequent to the aforedescribed transaction, on December 25, 1973, Leeds approached Norman Morris about purchasing half of his 40% interest. Before that date, Morris was neither involved in the above transaction, nor had he known of Leed's prior representation to loan Stein the $60,000.00. Morris did testify at trial that he was aware of Stein's financial difficulty at the time that he became Leed's partner and that his interest in the equity was purchased well below its probable value.
After a lengthy and complex trial, a jury returned a verdict in favor of Ms. Sawyer and against Bermil Corporation (Stein) for her brokerage commission, assessing damages at $6,000.00, the amount of the commission. In addition, Sawyer was awarded a favorable verdict against Leeds for the tortious interference with the Sawyer-Bermil Corporation brokerage contract. Damages were assessed by the jury in the like amount of $6,000.00. Finally, the jury returned a verdict in favor of Bermil Corporation and against Leeds, Morris and C.C.C. Investment Corporation on the former's cross-claim, finding that the sale-option transaction was, in reality, a device to cloth a usurious transaction. Damages in the amount of $73,000.00 were assessed by the jury.
From these three final judgments, this consolidated appeal follows.
Initially, it must be emphasized that all three final judgments under attack were rendered pursuant to a jury verdict. As such, certain appellate principles of law must be emphasized and cannot, sub judice, be understated. Those principles include the caveat that the function of an appellate court is not to substitute its judgment for that of the jury on disputed questions of fact. Fountainhead Motel, Inc. v. Massey, 336 So.2d 397 (Fla.3d DCA 1976). In addition, a judgment of the trial court reaches an appellate court clothed with a presumption of correctness, Keith v. Amrep Corporation, 312 So.2d 234 (Fla.1st DCA 1975), and will not be disturbed as long as there is any competent substantial evidence which can sustain the jury's verdict. South Carolina Insurance Company v. Wolf, 331 So.2d 337 (Fla.1st DCA 1976). Finally, it must be stated that any party seeking to have a jury verdict set aside admits, for purposes of that proceeding, all material facts as testified to by the opposing party together with all inferences favorable to the opposing party which might reasonably be drawn from the evidence as a whole. Thompson v. Jacobs, 314 So.2d 797 (Fla.1st DCA 1975).
With the above principles in mind, we first turn to the final judgment rendered against Leeds, Morris and C.C.C. Investment Corporation for usury. In order to establish a usurious transaction, certain elements must first be present. Firstly, there must be a loan, either expressed or implied, and an understanding between the parties that the money lent shall be returned. Secondly, it must appear that a greater rate of interest than is allowed by law has been or is about to be paid, or was agreed to be paid. Thirdly, there must exist an intent to wilfully and knowingly take more than the legal rate of interest for the use of the money loaned. Sharp v. Dixon, 252 So.2d 805 (Fla.4th DCA 1971).
Sub judice, the record reflects that there was competent substantial evidence to support the jury's verdict that the "sale-option to repurchase" transaction entered into between Bermil Corporation and C.C.C. Investment Corporation was but a camouflaged attempt to extract greater than the legal rate of interest from Bermil Corporation, at a time when its president, Milton Stein, was under the greatest of financial pressures. Notwithstanding the contents of the record, the parties to this particular appeal, Leeds, Morris and C.C.C. Investment Corporation, raise certain points on appeal which, they contend, will insulate them from liability  as a matter of law.
Firstly, all three appellants contend that, the "option to repurchase," given in conjunction with the sale, was not an unconditional, enforceable covenant and as such, they, as lenders, could not compel Bermil Corporation, as the borrower, to exercise the option and pay the usurious amount of *584 interest. The option to repurchase being conditional, appellants argue that as a matter of law, the requisite intent to extract a usurious rate of interest at the inception of the transaction was absent and thus, no prima facie case of usury could be established.
Generally, in order to establish a usurious transaction when a sale-option to repurchase is involved, the option must, in fact, be unconditional, compelling the vendor to repurchase the property sold at a sum which, if said sale was determined to be a disguise for a loan, would make the loan usurious. See Mears v. Mayblum, 96 So.2d 223 (Fla. 1957). As with every generality, however, there is a notable exception, best expressed in a scholarly, well-reasoned opinion from the Supreme Court of Hawaii, cited as Kawauchi v. Tabata, 49 Haw. 160, 413 P.2d 221 (1966). In that case, the court opined that in a transaction whereby a vendee purchases property for an amount much less than that property's value, and contemporaneously executes with the vendor an option to repurchase said property, then notwithstanding the fact that the option is not obligatory on the part of the vendor, a court might, upon a proper allegation of usury, disregard the form of the transaction and look to its substance.
We believe the reasoning in Kawauchi, supra, is sound and can be applied sub judice, for while the option to repurchase was not mandatory, the relative disparity between the sale price of a 40% interest in the shopping center and its true value dictated the exercise of the option. Thus, while the option, in and of itself, was not legally enforceable by the purchaser (appellants), it was economically binding, satisfying to our satisfaction, the "intent to extract usurious interest" requirement as required by the Sharp case, supra. As such, we cannot accept appellants' argument that C.C.C. Investment Corporation and Leeds did not have the intent needed, as a matter of law, to find them guilty of usury.
Appellant Edward Leeds next contends that his liability, as an individual, on the judgment was legally erroneous in that the "loan" was made in the name of C.C.C. Investment Corporation, only. There was, however, in our opinion, competent substantial evidence to support the verdict of the jury in that the record was permeated with examples of Leeds, as a corporate officer of C.C.C. Investment Corporation, personally utilizing the assets of the latter for the payment of personal obligations and investments; failing to maintain either the de jure or de facto existence of the corporate entity; and generally treating the corporation as a sham. As a matter of law, based on the above and even absent the allegation and proof of actual fraud, it was not error for a jury to pierce the corporate veil and find Leeds liable on an alter ego theory. See Levenstein v. Sapiro, 279 So.2d 858 (Fla. 1973), conformed to at 282 So.2d 11 (Fla.3d DCA 1973).
As for Norman Morris, however, the partner of Leeds, it is our opinion that the record will neither factually nor legally support his individual liability on the usurious transaction. As was previously mentioned, Morris was brought in as a partner of Leeds subsequent to the completion of the usurious transaction entered into between Stein and Leeds. There is nothing in the record that would lend itself to the interpretation that Morris knew the true circumstances of the transaction. Rather, the record reflects that Morris believed that he had made a purely advantageous purchase of an interest in the shopping center partly owned by Leeds. As a matter of law and fact then, the requisite "intent" factor needed to establish usury is noticeably absent as regards Morris, absolving him from liability. Sharp v. Dixon, supra.
We also find that the jury's verdicts against Bermil Corporation and Edward Leeds and in favor of Kay Sawyer were based upon competent substantial evidence. Firstly, as regards to the judgment entered against Bermil Corporation, it is no defense to the payment of a brokerage commission that the parties consummated the transaction upon different terms and without the participation of the broker when (1) *585 the broker initially brought the parties together and (2) the parties purposely excluded the broker from the negotiations by dealing with one another directly and in a clandestine manner. First Realty Corporation v. Standard Steel Treating Company, 268 So.2d 410 (Fla.4th DCA 1972); see also Estes v. Moylan, 94 So.2d 362 (Fla. 1957).
Regarding the judgment entered against Edward Leeds for the tortious interference of contractual relations, we turn to the case of Regan v. Davis, 97 So.2d 324 (Fla.2d DCA 1957) wherein the court stated that in order to establish a prima facie case of interference, it must be shown that (1) the acts were intentional and wilful; (2) said acts were calculated to cause damage to the plaintiff in his or her business; (3) that the acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (constituting malice); and (4) that actual damages and loss resulted. The facts sub judice support the jury's verdict as to the tort of interference with contractual relations.
Appellant Leeds nevertheless contends that once a judgment has been rendered in favor of a broker against the vendor on a contract action for the contract price, a second remedy of tortious interference with the contract cannot be pursued to judgment. We disagree. Where a vendor and vendee act in concert to deprive a broker of her commission pursuant to a contract entered into between the broker and the vendor, then an action for tortious interference with that contract will lie against the vendee, as well as an action for breach of the brokerage contract against the vendor. Mead Corporation v. Mason, 191 So.2d 592 (Fla.3d DCA 1966). Both remedies having been pursued to judgment, both Leeds and Bermil Corporation are both jointly and severably liable for the damages sustained by Sawyer, i.e., $6,000.00.
Accordingly, after carefully reviewing the record, briefs and arguments of counsel, it is our opinion that the final judgments rendered against Edward Leeds and Bermil Corporation for tortious interference with contract and breach of contract, respectively, are hereby affirmed. The final judgment rendered in favor of Bermil Corporation on its cause of action for usury is affirmed as to C.C.C. Investment Corporation and Edward Leeds, but reversed as to Norman Morris.
Affirmed in part; reversed in part and remanded for further proceedings.